UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

BEREKET TARIKU,

Plaintiff,

v.

OUTPUT SERVICES GROUP, INC.,

Defendant.

# COMPLAINT

**Case No. 25-CV-4006**

**ECF Case**

COMES NOW PLAINTIFF Bereket Tariku, by her undersigned attorney, for her Complaint against Defendant Output Services Group, Inc., and alleges as follows:

## NATURE OF THE ACTION

1. This is an action for sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, on the grounds that Plaintiff's manager subjected her to unwelcome sexual harassment and Defendant unlawfully retaliated against Plaintiff by terminating her employment after she complained of the harassment. Plaintiff asserts concurrent claims under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* and the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* By this action, Plaintiff seeks all available legal and equitable relief, including reinstatement, back pay, front pay, out of pocket costs, compensatory damages, punitive damages, civil fines and penalties, and attorney's fees and costs. Plaintiff demands trial by jury.

## PARTIES

2. Plaintiff **Bereket Tariku** is an adult person who resides in Brooklyn, New York.

3. For purposes of this action, Tariku is a citizen of New York.

4. At all relevant times, Tariku was an "employee" of Defendant within the meaning of Title VII and applicable state and city laws.

5. Defendant **Output Services Group, Inc. ("OSG")** is a foreign business corporation, incorporated in New Jersey and with its principal place of business either at 775 Washington Avenue, Carlstadt, NJ, 07072 (per New York Division of Corporations record search) or 900 Kimberly Drive, Carol Stream, IL, 60188 (corporate headquarters).

6. For purposes of this action, OSG is a citizen of New Jersey and Illinois.

7. OSG does business in New York and in this judicial district.

8. Upon information and belief, OSG has more than 1500 employees nationwide and annual revenues in excess of $500M.

9. At all relevant times, OSG was Plaintiff's "employer" within the meaning of Title VII and applicable state and city laws.

**<u>JURISDICTION AND VENUE</u>**

10. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 2000e-5(f)(3) (Title VII).

11. This Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity), because this is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. Alternatively, this Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367, because Plaintiff's federal, state, and city law claims derive from a common nucleus of operative facts and form part of the same case or controversy under Article III of the U.S. Constitution.

13. Defendant is subject to this Court's personal jurisdiction.

14. This Court has venue over this action pursuant to 28 U.S.C. §§ 1391(b)(1) and/or (b)(2), because Defendant resides in this judicial district (is subject to the Court's personal jurisdiction) and/or a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

15. This Court also has venue over this action pursuant to 42 U.S.C. § 2000e-5(f)(3) (Title VII), because this is the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice.

## ADMINISTRATIVE EXHAUSTION

16. Plaintiff properly exhausted her administrative remedies under Title VII prior to filing this action.

17. On December 23, 2024, Plaintiff filed a charge of discrimination against Defendant with the New York District Office of the U.S. Equal Employment Opportunity Commission.

18. The charge was assigned number 520-2025-01953.

19. On April 29, 2025, the EEOC issued a Dismissal and Notice of Rights. *See* **Exhibit A**.

20. This action is being filed within 90 days of Plaintiff's receipt of the Dismissal and Notice of Rights.

21. There are no administrative exhaustion requirements for Plaintiff's concurrent claims under the New York State Human Rights Law and the New York City Human Rights Law.

22. Pursuant to N.Y.C. Admin. Code § 8-502(c), Plaintiff will serve a copy of this Complaint on the New York City Commission on Human Rights, 22 Reade

Street, 3rd Floor, New York, New York, 10007, and the New York City Law Department, 100 Church Street, New York, New York, 10007.

## FACTUAL ALLEGATIONS

### *Background*

23. Plaintiff Bereket Tariku, who goes by "Lily," is a black female (b. 1984), originally from Ethiopia and having lived in several different countries.

24. Tariku has lived and worked in New York City since 2014.

25. Tariku was employed by OSG from March 18, 2024, until her wrongful termination on May 10, 2024.

26. Tariku's title was Plant Controller for OSG's facility in Carlstadt, New Jersey. Her primary duties involved overseeing the financial operations of the Carlstadt plant.

27. Tariku's annual base salary was $220,000. She was eligible for an incentive bonus of up to 20% of her base salary. She also was eligible for a full range of employee benefits, including health insurance, life insurance, and 401k plan.

28. Tariku was very well qualified for her position, and at all times performed her job duties in a satisfactory manner.

29. From the outset of her employment with OSG, Tariku followed a hybrid work schedule. Three days per week (Monday, Wednesday, Friday), she worked remotely from her home in Brooklyn, New York, using company-issued equipment and technology to perform her job duties. Two days per week (Tuesday, Thursday), she worked at the Carlstadt facility.

### *Sexual Harassment*

30. Tariku reported to Leo Rich, OSG's Chief Accounting Officer. Rich is a black male, approximately 55 years old.

31. During her application process, Tariku interviewed with Rich and Chief Financial Officer Brett Shroll. Shroll is a white male, approximately 50 years old.

32. Upon information and belief, the decision to hire Tariku was made by Rich.

33. Rich worked out of OSG's headquarters in Carol Stream, Illinois (a suburb of Chicago).

34. Throughout Tariku's employment, Rich repeatedly made inappropriate, unwelcome, and offensive sexual comments to Tariku.

35. Rich made these comments mainly during virtual meetings between himself and Tariku. These meetings took place when Tariku was working from her Brooklyn home as well as at the Carlstadt facility.

36. From the start of Tariku's employment until around the first week of April 2024, Rich required Tariku to join him for daily virtual meetings to review her work and to discuss his plans to reorganize the accounting department.

37. During these virtual meetings, Rich frequently commented on Tariku's personal appearance, including such comments as "I want to see your beautiful face" (after instructing her to turn on her video); "You're so beautiful"; "Your lips are kissable"; and "You look so hot today, I can't concentrate because I'm thinking about you."[1]

38. On one occasion, Rich said to Tariku, "Wow, you look nice today. I'm hard." He added, "I'm just kidding," but the comment left Tariku shocked and uncomfortable.

[1] All quotations are stated in sum and substance based on Tariku's recollection..

39. Rich also made several sexual comments about Ethiopian women, including, "I heard Ethiopian women are the most beautiful Africans and romantic" and "Is it true Ethiopian women are sexually driven and great in bed?"

40. In addition to the daily virtual meetings, Rich frequently called Tariku at random times throughout the day and evening. These calls, which were made via MS Teams, continued until Tariku's termination.

41. During these calls, Rich made the same types of inappropriate, unwelcome, and offensive sexual comments to Tariku as he made during their daily meetings.

42. On one occasion, around 7:00 p.m. or 8:00 p.m. Eastern Time, Rich gave Tariku a work task, then shifted the conversation to her personal life, asking her what she liked to do in the evenings and telling her that he was a homebody and that his "sexual life is dead."

43. Throughout Tariku's employment, Rich pressured Tariku to enter into a personal relationship with him. He repeatedly encouraged her to visit him in Chicago. He would say, "I'll take you to great restaurants in Chicago"; "Spending time with you will be refreshing"; "You should come to Chicago, and let's spend a great weekend together. I'll book a great hotel room." Rich would joke about his "dead" sex life, telling Tariku that he wanted to "ignite it with a sexy woman like yourself."

44. It was clear to Tariku that Rich was inviting her to enter into a "quid pro quo" sexual relationship with him. He told her that he would "protect" her from internal company politics "if you spend personal time with me" and "I'll do anything in my power for you." He offered her additional responsibilities managing other plants. At one point, Rich even remarked to her, "You know why I hired you."

45. Despite Rich's inappropriate behavior, Tariku maintained a strictly professional demeanor and focused on her job responsibilities. She did not go along with his banter and, on multiple occasions, told him that she expected their relationship to remain professional. But the harassing conduct persisted.

*The Chicago Trip*

46. In early April, at Rich's direction, Tariku travelled to OSG's headquarters – Rich's worksite – to join members of the audit team who were working on a project that did not involve Tariku.

47. The trip lasted from April 1-3, 2024.

48. During the trip, Tariku had almost no involvement with the work of the audit team. Instead, Tariku was assigned a separate, empty meeting room, where she spent most of the trip working remotely with her own team and performing her regular job duties.

49. In reality, the purpose of Tariku's trip was to enable Rich to continue his sexual pursuit of her in person. As Rich told her after she arrived, "The reason I made you come to Chicago was to see your sexy body in person and spend time with you."

50. While she was at headquarters, Rich summoned Tariku to his office to discuss his reorganization plans, which he said would involve making Tariku the head of more plants. These professional discussions were interspersed with sexually charged comments and requests that Tariku spend personal time with him, for example, going out to dinner.

51. While Tariku was at headquarters, Rich made comments to her about her "sexy body"; he asked her to show him her hotel room; he told her "I saw you

during the interview, but now I see your hourglass body"; and he remarked (in reference to one of her casual outfits) that "I really have a soft spot for a backside."

52. At all times, Tariku politely but firmly rejected Rich's invitations. After she continued to reject his advances, on the second day of her trip, Rich cancelled their recurring meetings, saying, "What's the point of meeting if I can't have you?"

53. This was a sensitive, embarrassing, and shocking experience for Tariku, who carries herself in the workplace with dignity and professionalism. As a newly-hired Plant Controller – a leadership role – she had to consider very carefully how to handle such unwanted attention from a senior executive like Rich. She was hoping to find a solution to the problem that would preserve her position – one in which she believed she could have a long, successful tenure – without unnecessarily offending Rich.

*Termination*

54. After Tariku returned from Chicago, Rich's attitude towards her grew increasingly hostile, although he continued to make inappropriate comments. To instill fear for her position, Rich started telling Tariku that she would face push back from other members of her team. At the same time, he told Tariku that if she spent time with him, he would "protect" her. During one lengthy meeting, Rich said, "You're the first hot employee I've worked with, and I will help you as long as you're available for me and willing to spend time with me."

55. The situation with Rich reached a breaking point during a virtual meeting on May 6, 2024. Tariku was working from home that day. Their meeting lasted more than one and a half hours, during which Rich was manipulative and emotionally abusive. On the one hand, he praised Tariku profusely, telling her that

"I've been supporting you. I spoke highly of you to Brent. I said you were commanding in the IT meeting [referring to a meeting that Tariku had organized in late April to discuss automating certain accounting functions]. You're smart and professional." But then Rich turned from supportive to threatening, telling Tariku, "But you need to work on your goodwill." The conversation left Tariku confused and emotionally distressed, and she briefly cried in front of Rich. The message to Tariku was loud and clear – her only path forward at OSG was if she gave in and agreed to have a personal relationship with Rich. Tariku told Rich that she was going to report his behavior to HR.

56. In the morning on May 7, 2024, Tariku emailed Chief Human Resource Officer Kathy Marocchi (who worked at OSG's headquarters), asking her for a meeting "to discuss an important human resource related concern Leo [Rich] shared with me." Given the sensitivity of the matter, Tariku did not explicitly detail the sexual harassment and hostile work environment she was experiencing from Rich, but her intention was to address these concerns during her meeting with Marocchi.

57. Tariku had a virtual meeting with Marocchi later that day. During the meeting, Tariku expressly told Marocchi about the sexual harassment by Rich. In response, Marocchi told Tariku, "This is a very sensitive topic," and that she wanted to have the legal department involved. At the same time, Marocchi tried to deflect Tariku's concerns, saying, "Both of you are minorities. I don't see why you couldn't work together."

58. Later that night, Tariku decided to escalate her complaint to CFO Brett Shroll (who also worked at OSG's headquarters). Shortly after midnight on May 8, 2024, Tariku emailed Shroll, stating "I'd like to speak with you about

multiple issues/adversities I'm having at work that I find disheartening." On May 8, Shroll's assistant scheduled a virtual meeting between Tariku and Shroll for Thursday (May 9), which was rescheduled for Friday (May 10).

59. On May 10, 2024, when Tariku logged onto the meeting that she expected to have with Shroll, she was met instead by Marocchi and Rich. Marocchi told Tariku that she was being fired. When Tariku asked for the reason, Marocchi said something about her being "condescending" and that "we are looking for an emotionally calm employee." Marocchi told Tariku that her personal belongings from her office would be mailed to her, but Tariku never received them. The meeting lasted only 1-2 minutes.

60. Instead of exercising reasonable care to prevent and correct Rich's harassing behavior, Defendant retaliated against Tariku and terminated her employment.

61. This entire experience has caused Tariku to suffer substantial lost income and benefits and significant mental and emotional distress.

62. Tariku's total compensable damages exceed $75,000, exclusive of interest and costs.

## CLAIMS FOR RELIEF

63. Based on the factual allegations set forth above, along with reasonable inferences drawn in Plaintiff's favor, Plaintiff asserts the following claims against Defendant:

64. Count One: Sexual harassment in violation of Title VII;

65. Count Two: Retaliation and wrongful termination in violation of Title VII;

66. Count Three: Sexual harassment in violation of the New York City Human Rights Law;

67. Count Four: Retaliation and wrongful termination in violation of New York City Human Rights Law;

68. Count Five: Sexual harassment in violation of the New York State Human Rights Law;

69. Count Six: Retaliation and wrongful termination in violation of New York State Human Rights Law;

70. Defendant was maliciously and/or recklessly indifferent to Plaintiff's federal, city, and state law rights.

71. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff has suffered pecuniary and non-pecuniary damages, including lost income and benefits and mental and emotional distress, for which she is entitled to an award of reinstatement, back pay, front pay, out of pocket costs, compensatory damages, punitive damages, civil fines and penalties, and attorney's fees and costs, and all other available legal and equitable relief.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury as to all issues triable by jury in the above-captioned civil action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment against Defendant on each of her claims under Title VII, the New York City Human Rights Law, and the New York State Human Rights Law, and award her the following relief:

A. Back pay in an amount to be determined at trial;
B. Front pay in an amount to be determined at trial;
C. Out of pocket costs in an amount to be determined at trial;
D. Compensatory damages in an amount to be determined at trial;
E. Punitive damages in an amount to be determined at trial;
F. Civil fines and penalties in an amount to be determined at trial;
G. Pre-judgment and post-judgment interest as allowed by law;
H. Attorney's fees and costs as allowed by law;
I. Appropriate injunctive relief, including reinstatement; and
J. Such other relief as justice may require.

Dated: July 18, 2025

Respectfully submitted,

By: /s/ Steven M. Warshawsky

Steven M. Warshawsky, Esq. (SW 5431)
The Warshawsky Law Firm
118 North Bedford Road, Suite100
Mount Kisco, New York 10549
T: (914) 864-3353
E: smw@warshawskylawfirm.com
W: www.warshawskylawfirm.com

Tomasz J. Piotrowski, Esq. (TP 5515)
T.J. Piotrowski Law Firm
176 Kent Street, Suite 2L
Brooklyn, NY 11222
T: (917) 612-0788
E: tomjerzy@msn.com

*Attorneys for Plaintiff*